UNITED STATES of America, Plaintiff,

v.

Alfredo HODOYAN–PALACIOS, Defendant.

No. CR 97–1799 JM.

United States District Court, S.D. California.

Jan. 20, 1998.

Laura J. Birkmeyer, Asst. U.S. Atty., for U.S.

David Z. Chesnoff, Las Vegas, NV, for Defendant.

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

MILLER, District Judge.

Defendant Alfredo Hodoyan–Palacios ("Hodoyan") moves to suppress statements he made to governmental agents. Plaintiff United States of America ("United States") opposes the motion and argues that Hodoyan's detention was lawful as part of an investigatory detention or, alternatively, that the independent source exception is applicable and the statements need not be suppressed. Having considered the papers submitted, the record before the court, the extensive testimony presented at the time of the hearing, the arguments of counsel, and the applicable authority, the court denies defendant's motion to suppress statements.

### BACKGROUND

The government submits that a cartel commonly known as the Arellano–Felix drug trafficking organization ("AFO") is believed by law enforcement agencies to be one of the most violent drug trafficking organizations in the Republic of Mexico ("Mexico"). It is claimed the AFO is linked to the murder and bombing of competitors, cooperating sources of information, and the slaying of Mexican Cardinal Juan Jesus Posada. The AFO is known by law enforcement to control the transportation and distribution of illegal narcotics in Northern Mexico and is responsible for the distribution of ton quantities of cocaine and marijuana in the United States.

DEA agents have had extensive contacts with the Mexican government and confidential sources of information ("CSO") concerning the AFO. The DEA was informed that Emilio Valdez–Mainero ("Valdez") was a high ranking lieutenant with the AFO, that he was in direct contact with brothers Benjamin and

Ramon Arellano–Felix, and that he was directly involved in carrying out several assassinations within Mexico.

On or about September 27, 1996, Mexican officials informed the DEA that Valdez, along with Fabian Martinez–Gonzalez, also reported to be a known AFO assassin, was staying in the exclusive Cabrillo Tower, in the City of Coronado, California. In mid-September 1996, DEA agents met with another CSO who informed the agents that he was told by a high ranking member of the AFO that Martinez–Gonzalez was involved in the ambush and execution of Dr. Ibarra–Santes of the Mexican Federal Judicial Police.

On September 27, 1996, DEA agents proceeded to the Cabrillo Tower, obtained a positive identification of Valdez and a probable identification of Martinez–Gonzalez. Another CSO indicated that Valdez extensively utilized public telephones in the lobby of Cabrillo Towers, apparently in an effort to evade police detection. On September 29, 1996, DEA agents were provided with a copy of a Mexican arrest warrant for Valdez. The agents continued their surveillance and, on September 30, 1997, obtained an arrest warrant for Valdez.

Due to Valdez' history of reported assassinations, and agents' knowledge that AFO members are often armed, accompanied by bodyguards when they travel, have resisted law enforcement capture in Mexico, and utilize sophisticated communications systems, agents decided for their own safety and that of the public to perform a "hot stop." In a coordinated effort by the FBI, DEA, INS, and the Coronado Police Department, nearly 40 officers in all, conducted a stop of the vehicle containing Valdez and a second Hispanic male, later identified as defendant Hodoyan. The hot stop occurred at 1:09 p.m. on a major arterial located on the Silver Strand, near the Del Coronado Hotel.

When the vehicle was stopped, agents noted several cellular phones in the front seat as well as a two-way radio. Given the agents' concern that either Hodoyan or Valdez may have broadcast their detention over the two-way radio, the agents determined that there was a possibility that other AFO members could attempt to rescue Valdez and Hodoyan. In recognition of this threat to their own safety, and that of the public, they agents decided to detain Hodoyan, whose identity had yet to be confirmed, and proceed to the Coronado Police Department ("CPD") for further investigation.

At approximately 1:25 p.m. Hodoyan and Valdez arrived at CPD. At approximately 1:40 p.m., Hodoyan was processed for identification. Although Hodoyan had identified himself truthfully, he had no picture identification. At approximately 2:00 p.m., DEA agent Gamez responded to a request to assist in processing Hodoyan. When agent Gamez heard Hodoyan's name, he recalled that Hodoyan had been mentioned as an assassin for the AFO. To confirm his recollection, he contacted agent Villareal in Monterey, Mexico. Agent Villareal confirmed that Hodoyan was a reputed assassin for the AFO and informed agent Gamez that he would inquire into the existence of a warrant with the Mexican government.[1] Later, agent Villareal advised agent Gamez that Mexican authorities were preparing a provisional warrant for Hodoyan.

At approximately 2:15 p.m., Hodoyan voluntarily agreed to fingerprinting, was given his Miranda warnings and was placed in a cell pending confirmation of his identify and criminal history. After obtaining a search warrant of the Cabrillo Tower condominium at 2:45 p.m. that day, agents searched the condominium and found documents indicating Hodoyan's undisputed dominion and control over the south-central bedroom of the condominium along with several ounces of marijuana and an AK 47 assault rifle. Agents also

---

1. Defendant is wanted by Mexico on several charges of homicide and criminal conspiracy related to the September 14, 1996 assassinations of Dr. Ernest Ibarra–Santos and three of his companions. Mexico also seeks extradition of Hodoyan for drug-trafficking activities of the AFO. On December 19, 1997, United States Magistrate Judge Anthony Battaglia issued an order certifying that Hodoyan was extraditable to Mexico under the Extradition Treaty between the United States and Mexico. On January 15, 1997, United States District Court Judge Marilyn Huff denied defendant's petition for a writ of habeas corpus, thus affirming Magistrate Battaglia's extradition order.

located cellular phones and a two-way radio in Hodoyan's bedroom. At around 5:00 p.m. Hodoyan was reminded of his Miranda rights, voluntarily waived those rights, and confessed to possession of the assault rifle and marijuana. It is this confession that Hodoyan seeks to suppress.

## DISCUSSION

### A. The Investigatory Stop

The Fourth Amendment is not a guarantee against all searches and seizures, but only against unreasonable searches and seizures. In evaluating the reasonableness of an investigative stop, the issue is

> whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.

*Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In *Terry*, the Supreme Court recognized that when a police officer accosts an individual and restrains his freedom to walk away, the individually has been "seized." Notwithstanding the seizure, the fundamental right or duty of an officer to investigate potential crime outweighs a minimal intrusion on the suspected individual.

■ A valid investigatory stop must be temporary, based upon reasonable suspicion, and last no longer than necessary to effectuate the purpose of the stop. *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). In determining whether an investigative detention ripens into an arrest, the court must evaluate the totality of the circumstances. *Eberle v. City of Anaheim*, 901 F.2d 814, 819 (9th Cir.1990). Defendant urges the court to draw a line of reasonableness at the point where defendant was taken to CPD, fingerprinted, and provided his Miranda advisements (approximately 2:15 p.m. on the time line). However, the Supreme Court has repeatedly rejected a bright line rule. "In assessing the effect of the length of the detention, we take into account whether the police diligently pursue their investigation." *United States v. Place*, 462 U.S. 696, 709, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983).

■ In evaluating whether an investigative detention is unreasonable, "common sense and ordinary human experience must govern over rigid criteria." *United States v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985).

> If the purpose underlying a *Terry* stop—investigating possible criminal activity—is to be served, the police must under certain circumstances be able to detain the individual for longer than the brief time period involved in *Terry* and *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

*Sharpe*, 470 U.S. at 685–86 (quoting *Michigan v. Summers*, 452 U.S. 692, 700, n. 12, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981)). In *Sharpe*, the Supreme Court looked to the totality of the circumstances and concluded that defendant's 20 minute detention was reasonable because the police pursued the investigation in a diligent and reasonable manner.

■ Here, the investigative detention of Hodoyan is reasonable in light of all surrounding circumstances. As to the first inquiry, the government had an articulable and reasonable suspicion to believe that persons later identified as Hodoyan and Valdez had engaged in criminal activity including murder for hire, drug trafficking, and were top officers and assassins of the AFO. At the time of the "hot stop," Agent Leo Ducey testified that he recognized Valdez and assumed that Hodoyan was in fact Martinez–Gonzalez. Agent Ducey also believed that Valdez, the passenger in the car, was a reported dangerous assassin and drug trafficker who frequently traveled with armed body guards such as Martinez–Gonzalez, who was reported to be traveling with Valdez.

Similarly, the second inquiry, whether the investigative detention was "reasonably related in scope to the circumstance which justified the interference in the first place," *Terry*, 392 U.S. at 20, is satisfied. Following several days of surveillance at the exclusive Cabrillo Tower, governmental agents positively identified Valdez and reasonably believed, based on information provided by the Mexican government, that Valdez was accom-

panied by Martinez–Gonzalez, another dangerous, known assassin. At the time of the "hot stop" to execute the arrest warrant for Valdez, Agent Ducey testified that he believed Hodoyan to be Martinez–Gonzalez. Although Hodoyan truthfully stated his name, he did not provide any picture identification. Believing that either Hodoyan or Valdez could have alerted other AFO members by means of the two-way radio, the agents on the scene were concerned that there could be a rescue attempt thereby threatening the security of both the agents and the safety of the public. Agent Ducey testified that for reasons of safety Hodoyan and Valdez were removed to CPD at approximately 1:25 p.m.

Shortly thereafter, Agent Gamez responded to a request to process Hodoyan. At approximately 2:00 p.m., Gamez spoke with DEA Agent Villareal in Mexico concerning Valdez and Martinez–Gonzalez. Agent Gamez then saw Hodoyan for the first time and realized that he was not Martinez–Gonzalez. When Hodoyan truthfully identified himself, Agent Gamez recognized the name and believed Hodoyan to be an assassin for the AFO and wanted on murder charges in Mexico. Agent Gamez then called Agent Villareal in Mexico who confirmed that Hodoyan was a reported assassin for the AFO. Agent Villareal stated that he would check with the Mexican government to determine if there was an outstanding arrest warrant for Hodoyan. At 2:15 p.m. Hodoyan was asked to provide fingerprints and he complied with this request. At approximately 2:30 to 2:40 p.m. Agent Gamez again spoke with Agent Villareal regarding a provisional arrest warrant for Hodoyan.

Meanwhile at approximately 2:45 to 3:10 p.m. agents executed an arrest warrant on the condominium. Agents discovered in the small (south-central) bedroom various documents indicating Hodoyan exercised undisputed dominion and control over the bedroom. Agents also located marijuana, rolling papers, an AK 47 assault rifle, and various devices associated with the communications equipment discovered a short time earlier during the hot stop. Based upon the discovery of these items, the government had probable cause to believe that Hodoyan was engaged in criminal activity.

The totality of the circumstances indicates that the government was engaged in a swiftly developing situation, that it acted diligently to pursue its investigation of Hodoyan to confirm his identity and his involvement in criminal activity, and that the government acted reasonably to protect public safety. Defendant presented no evidence that the governmental agents were dilatory in their investigation. The delay in this case is attributable almost entirely to the simple fact that the multiple murders, drug trafficking, and racketeering activities allegedly committed by Hodoyan occurred in Mexico. Finally, while the court is mindful that the over 2 hour detention was extended, the totality of the circumstances rendered this a permissive investigatory detention. Governmental agents rarely confront such a high-level dangerous situation where an alleged assassin of a large criminal organization presents such an immediate potential threat to public safety and welfare. Under the circumstances identified herein, the investigatory detention was reasonable under the Fourth Amendment.

### B. The Confession Is Not Tainted

 Even assuming that the investigatory detention ripened into an arrest without probable cause by 2:15 p.m., as urged by Hodoyan, the confession need not be suppressed because the confession was derived, not from the exploitation of the illegal arrest, but from the discovery of lawfully obtained evidence discovered in the condominium. Suppression of Hodoyan's statements is appropriate only where the challenged evidence was "come at by exploitation of the initial illegality [but need not be suppressed if the evidence is] sufficiently distinguishable to be purged of the primary taint." *Segura v. United States,* 468 U.S. 796, 804–05, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984), quoting *Wong Sun v. United States,* 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *United States v. Jones,* 608 F.2d 386, 390 (9th Cir.1979). To determine the causal connection between the illegality and the statements, the court does not apply a simple "but

for" test but, rather, considers the following three factors:

First, we consider the proximity of the illegal arrest with the seizure of the evidence. Second, we consider whether there were independent intervening events that led the police to the evidence. Third, we consider the effect of suppression on the exclusionary's rule purpose of deterring police misconduct. The three factors are closely interrelated.

*United States v. Shephard,* 21 F.3d 933, 939 (9th Cir.1994).

Applying these factors weighs against suppression. First, if an illegal arrest occurred, defendant contends such an arrest would have occurred no later than by approximately 2:15 p.m. Hodoyan was again advised of his constitutional rights at 4:00 p.m. and at 5:00 p .m. Hodoyan was reminded of those rights and questioning commenced. The nearly three hour delay between the claimed illegal arrest and the statements sought to be suppressed is sufficiently attenuated from any illegality and weighs against finding that the statements were the result of an exploitation of any illegal arrest. Second, the search of the condominium is an intervening event; without the discovery of the marijuana and assault rifle at the condominium, Hodoyan would not have been interrogated concerning this evidence. Moreover, the search of the condominium was conducted in reference to Valdez's activities, and not those of Hodoyan. A review of the search warrant and affidavit supports this conclusion as there is no reference to Hodoyan's activities in the search warrant. Finally, application of the exclusionary rule to the circumstances of this case would not likely deter police misconduct. The government reasonably believed that Hodoyan presented extraordinary risks to public safety as evidenced by the circumstances set forth herein. By the time Hodoyan contends that an illegal arrest occurred (at 2:15 p.m.), Agent Gamez learned the identify of Hodoyan and reasonably suspected that he was an assassin for the AFO and that he was wanted by the Mexican government for drug trafficking and murder. Consequently, it is highly unlikely that suppression of Hodoyan's confession would deter police officers from making an illegal arrest which would result in the release of an individual reasonably believed, on well-founded grounds, to be a known dangerous felon.

The court observes that release of Hodoyan from detention at 2:15 p.m. would have placed the government and society not in the same position as before the asserted illegal arrest, but in a worse position because of the real risk of flight presented by Hodoyan's release from detention and the suspected likelihood of continued criminal activity. Where, as here, extreme and truly rare circumstances of public harm are reasonably demonstrated, common sense dictates that the relative intrusion on Hodoyan's Fourth Amendment rights was, on balance, minimal and outweighed by legitimate law enforcement purposes, diligent police work, and society's need to protect itself from dangerous organized crime activities.

Having carefully considered the papers submitted, the testimony presented at the hearings, the parties' arguments and the law, for the reasons set forth herein, the court denies Hodoyan's motion to suppress statements.

**IT IS SO ORDERED.**