[No. S137137. Jan. 25, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
AVELINO LEON et al., Defendants and Appellants.

378

**COUNSEL**

Kenneth H. Lewis, Peter N. Priamos and Arthur Lewis for Defendant and Appellant Avelino Leon.

Sandra Uribe and Nancy Gaynor, under appointments by the Supreme Court, for Defendant and Appellant Victor Aceves.

Bill Lockyer, Attorney General, Robert R. Anderson and Mary Jo Graves, Chief Assistant Attorneys General, Pamela C. Hamanaka, Assistant Attorney General, Steven D. Matthews, Kristofer Jorstad and Mary Sanchez, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BAXTER, J.**—Defendants Avelino Leon and Victor Aceves were arrested as part of an investigation into the Arellano-Felix drug trafficking organization, which was "believed by law enforcement agencies to be one of the most violent drug trafficking organizations in the Republic of Mexico." (*U.S. v. Hodoyan-Palacios* (S.D.Cal. 1998) 993 F.Supp. 789, 790.) Defendants seek to suppress the contents and all fruits of five wiretaps that were instituted as part of the investigation, claiming that the wiretaps violated California law (Pen. Code, § 629.52, subd. (d)) and the Fourth Amendment in that the government's affidavits in support of the applications failed to establish necessity for the wiretaps.

Both the superior court and the Court of Appeal determined that the wiretaps were lawful and denied defendants' motion to suppress. (Pen. Code, § 629.72.) We affirm.

### BACKGROUND

The five wiretaps at issue here—wiretap Nos. 00-02 and 00-04, wiretap No. 00-02 extension No. 1, and wiretap No. 00-39 extension Nos. 1 and 2—were part of a multiagency task force investigation of a major Mexico-based narcotics trafficking organization that culminated in the arrest of 23 people in the United States. The arrests included narcotics suppliers, importers, distributors, transporters, and customers. Approximately 214 kilos of cocaine, 1,150 pounds of marijuana, $1.2 million in United States currency, and numerous firearms (including assault weapons) were seized.

Evidence obtained from the wiretaps was used to prosecute defendants Avelino Leon and Victor Aceves in state court. After the superior court denied their motions to suppress the contents of the wiretaps and any evidence seized therefrom (Pen. Code, § 629.72), Leon pleaded no contest to possession with intent to distribute in excess of 20 kilos of cocaine and was sentenced to 17 years in prison. Aceves pleaded no contest to conspiracy to sell in excess of 10 kilos of cocaine, as well as use of a false compartment in

a motor vehicle with intent to conceal controlled substances, and was sentenced to 15 years eight months.

*Wiretap No. 00-02*

The Los Angeles County District Attorney's application for wiretap No. 00-02, dated January 25, 2000, was supported by an affidavit from Stephen P. Diederich, a special agent with the federal Drug Enforcement Administration. The application described "Target Telephone #1" as a prepaid cell phone subscribed to by one Guillermo Rodriguez of 4727 West 17th Street in Lawndale and requested authorization to intercept communications by Rodriguez, Leon, Aceves, unidentified males Nos. 1 and 2, and other coconspirators. Special Agent Diederich stated that Guillermo Rodriguez was an "unidentified person" and that the Lawndale address was a fictitious address—although defendants Leon and Aceves did reside at 4727 West 149th Street in Lawndale. Diederich explained that, in his experience, high-level drug traffickers frequently use prepaid cell phones because no identification is required, the phones can be thrown away at any time, and the replacement phone cannot be traced back to the user.

The affidavit described an ongoing investigation using wiretaps into a Mexican-based drug trafficking organization with associates in Los Angeles. The investigation had resulted in the arrests of several conspirators and the issuance of arrest warrants for other fugitives. A prior wiretap on a discarded prepaid cell phone (wiretap No. 99-32) had revealed numerous contacts during the period of April to June 1999 between narcotics traffickers from the Los Angeles-based distribution network and an unidentified male, who was believed to be a top-ranked United States-based manager for the organization. Special Agent Diederich believed that Target Telephone #1 was being used by the holder of the discarded cell phone that was the subject of the prior wiretap (No. 99-32), or by a person playing a similar role in the organization, because the phones had dialed more than two dozen numbers in common. Prior intercepts of conversations involving those common numbers related to the manufacturing of methamphetamine, money laundering, and illegal border crossings.

The affidavit declared that a wiretap was necessary in order to achieve the objectives of the investigation—namely, obtaining direct evidence to convince a jury beyond a reasonable doubt of the full scope, extent, and personnel of the narcotics trafficking conspiracies; the identities and roles of all suppliers of narcotics to the identified conspirators; the identities and roles of the main customers of the identified conspirators; the stash location where

the narcotics were stored before distribution; the organization's method of distributing narcotics; and the management and disposition of proceeds generated by the organization's narcotics trafficking. Special Agent Diederich then listed the investigative techniques he had already used or had considered using in the investigation and explained why these techniques were not likely to succeed in identifying all members of the organization and establishing beyond a reasonable doubt the full scope of the conspiracy. These techniques included the use of a confidential informant; the conduct of physical surveillance; the use of pen registers, trap-and-trace devices, toll analysis, and telephone subscriber information; search warrants and trash searches; and witness interviews, grand jury subpoenas, and grants of immunity. Diederich noted, in particular, that he had been unable to identify the true user of Target Telephone #1 or to locate the target telephone's physical whereabouts.

Special Agent Diederich also explained that, based on his training and experience, leaders of narcotics trafficking organizations often do not physically handle the narcotics. Because high-level traffickers issue logistical instructions by telephone (and thus avoid contact with the narcotics), law enforcement would be able to discover, through the interception of Target Telephone #1, when narcotics shipments arrive and which cell heads are to receive those shipments.

Los Angeles County Superior Court Judge Larry P. Fidler approved the application on January 25, 2000, finding probable cause to believe that the target subjects had committed, were committing, and were about to commit offenses involving the importation, possession for sale, transportation, and sale of cocaine (and conspiracy to commit these offenses) (Pen. Code, § 629.52, subd. (a));[1] probable cause to believe that communications concerning these crimes had been, were being, and would be made over Target Telephone #1, and that information concerning those crimes would be obtained through the interception (§ 629.52, subds. (b), (c)); and that normal investigative procedures had been tried and had failed or reasonably appeared either to be unlikely to succeed if tried or to be too dangerous (§ 629.52, subd. (d)). The wiretap was approved for 30 days.

*The Remaining Wiretaps*

Based on the information obtained from wiretap No. 00-02, Special Agent Diederich confirmed that Leon was the user of Target Telephone #1 and submitted a new application (wiretap No. 00-04) for that cell phone, four other cell phones, and two pagers. The affidavit disclosed that aerial surveil-

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

lance in January 2000 had proved unhelpful, that the intercepted conversations had been "extremely coded" and the participants had identified themselves for the most part only by moniker, and that the identities of the users and the physical whereabouts of most of the phones were unknown.

The affidavits for the remaining wiretap application extensions recounted the progress of the investigation, including the seizure of eight kilos of cocaine from a Los Angeles hotel and the seizure of $260,125 in cash at the Los Angeles International Airport in January 2000, the seizure of 1,150 pounds of marijuana at an Alhambra apartment in February 2000, and the seizure of 172 kilos of cocaine in three separate incidents in April and May 2000. The affidavits also recited that the seizures nonetheless had yielded little information as to the organization's source of supply or method of distribution; that the task force's attempts at physical and aerial surveillance had been detected and, on occasion, compromised; and that Leon appeared to be coordinating a large shipment of narcotics in the near future. On September 13, 2000, agents from the Drug Enforcement Administration arrested 23 people, including Leon and Aceves.

DISCUSSION

"In general, California law prohibits wiretapping." (*People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1195 [105 Cal.Rptr.2d 187]; see § 631.) The Presley-Felando-Eaves Wiretap Act of 1988 authorized specified law enforcement officials to apply for a court order to intercept wire communications, but only where there was probable cause to believe the target was involved in the importation, possession for sale, transportation, manufacture, or sale of heroin, cocaine, PCP, or methamphetamine in specified quantities, or in a conspiracy to commit those offenses. (Former § 629.02, subd. (a)(1), (2), added by Stats. 1988, ch. 111, § 2, p. 450.) In 1995, the Legislature enacted section 629.50 et seq. in order "to expand California wiretap law to conform to the federal law." (Sen. Com. on Crim. Proc., Rep. on Sen. Bill No. 1016 (1995–1996 Reg. Sess.) as amended Apr. 3, 1995, p. i.) Thus, the district attorney or other specified individual could apply to the presiding judge of the superior court (or a designee) for an order to intercept not only wire communications but also "electronic digital pager" and "electronic cellular telephone" communications. (Former § 629.50, added by Stats. 1995, ch. 971, § 10, p. 7395.) The new scheme also expanded the list of target crimes to include murder, solicitation to commit murder, the commission of a crime involving the bombing of public or private property, or aggravated kidnapping. (§ 629.52, former subd. (a)(2), added by Stats. 1995, ch. 971, § 10,

p. 7395.) Subsequent amendments added to the list of target crimes the participation in a criminal street gang (§ 629.52, subd. (a)(3), amended by Prop. 21, approved Mar. 7, 2000) as well as felonies involving weapons of mass destruction or restricted biological agents (*id.*, subd. (a)(4), amended by Stats. 2002, ch. 605, § 3).

■ Under current section 629.52, the designated judge may authorize a wiretap if there is probable cause to believe that an individual has committed, is committing, or is about to commit one or more of the listed crimes (§ 629.52, subd. (a)); there is probable cause to believe that communications concerning the illegal activities will be obtained through that interception (§ 629.52, subd. (b)); there is probable cause to believe that the communications device will be used by the person whose communications are to be intercepted (§ 629.52, subd. (c)); and "[n]ormal investigative procedures have been tried and have failed or reasonably appear either to be unlikely to succeed if tried or to be too dangerous" (§ 629.52, subd. (d) (section 629.52(d))).

Defendants do not challenge the issuing court's finding of probable cause as to any of the wiretaps. They complain only that the wiretap applications were not supported by an adequate showing of necessity within the meaning of section 629.52(d), and that the evidence seized as fruit of the wiretaps must be suppressed under section 629.72.[2] Because defendants' claim of constitutional error parallels their claim of statutory error, we begin with their claim that the wiretap applications failed to support Judge Fidler's finding of necessity under section 629.52(d). (*People v. Jackson* (2005) 129 Cal.App.4th 129, 149 & fn. 38 [28 Cal.Rptr.3d 136]; see generally *People v. McKay* (2002) 27 Cal.4th 601, 608, fn. 3 [117 Cal.Rptr.2d 236, 41 P.3d 59].)

■ Our analysis of section 629.52 is necessarily informed by title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 United States Code sections 2510 to 2520, which "provides a 'comprehensive scheme for the regulation of wiretapping and electronic surveillance.' " (*People v. Otto* (1992) 2 Cal.4th 1088, 1097 [9 Cal.Rptr.2d 596, 831 P.2d 1178].) As we have previously observed, title III "establishes minimum standards for the admissibility of evidence procured through electronic surveillance; state law cannot be less protective of privacy than the federal Act." (*Otto, supra,* 2 Cal.4th at p. 1098.) With respect to necessity, the sole issue presented here, state law

---

[2] Section 629.72 provides: "Any person in any trial, hearing, or proceeding, may move to suppress some or all of the contents of any intercepted wire, electronic pager, or electronic cellular telephone communications, or evidence derived therefrom, only on the basis that the contents or evidence were obtained in violation of the Fourth Amendment of the United States Constitution or of this chapter. The motion shall be made, determined, and be subject to review in accordance with the procedures set forth in Section 1538.5."

and federal law employ nearly identical language. Each requires the judge, before authorizing a wiretap, to find that normal investigative techniques "have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." (18 U.S.C. § 2518(3)(c); see Pen. Code, § 629.52(d).)

 The requirement of necessity is designed to ensure that wiretapping is neither "routinely employed as the initial step in criminal investigation" (*United States v. Giordano* (1974) 416 U.S. 505, 515 [40 L.Ed.2d 341, 94 S.Ct. 1820]) nor "resorted to in situations where traditional investigative techniques would suffice to expose the crime." (*United States v. Kahn* (1974) 415 U.S. 143, 153, fn. 12 [39 L.Ed.2d 225, 94 S.Ct. 977].) The necessity requirement can be satisfied "by a showing in the application that ordinary investigative procedures, employed in good faith, would likely be ineffective in the particular case." (*U.S. v. McGuire* (9th Cir. 2002) 307 F.3d 1192, 1196.) As numerous courts have explained, though, it is not necessary that law enforcement officials exhaust every conceivable alternative before seeking a wiretap. (*Id.* at p. 1197; see also *Twenty-seventh Annual Review of Criminal Procedure, Investigation and Police Practice: Electronic Surveillance* (1998) 86 Geo. L.J. 1289, 1294–1295, fn. 420 [collecting cases].) Instead, the adequacy of the showing of necessity " 'is "to be tested in a practical and commonsense fashion," . . . that does not "hamper unduly the investigative powers of law enforcement agents." ' " (*U.S. v. Oriakhi* (4th Cir. 1995) 57 F.3d 1290, 1298.) A determination of necessity involves " 'a consideration of all the facts and circumstances.' " (*United States v. Hyde* (5th Cir. 1978) 574 F.2d 856, 867, quoting Sen.Rep. No. 90-1097, 90th Cong., 2d Sess. (1968), reprinted in 1968 U.S. Code Cong. & Admin. News, pp. 2112, 2190.)

The finding of necessity by the judge approving the wiretap application is entitled to substantial deference. (*People v. Zepeda, supra,* 87 Cal.App.4th at p. 1204; accord, *U.S. v. Martinez* (1st Cir. 2006) 452 F.3d 1, 4; *U.S. v. McLee* (7th Cir. 2006) 436 F.3d 751, 763; *U.S. v. Butz* (9th Cir. 1993) 982 F.2d 1378, 1383.)[3]

[3] Although the parties agree that we review deferentially the issuing judge's determination that the wiretap was necessary, they disagree as to the precise formulation of the standard of review. Defendants, for the first time in this proceeding, urge us to follow the Eighth Circuit, which has held that the necessity finding predicate to the issuance of a wiretap order under 18 United States Code section 2518(3)(c) is a factual determination reviewed for clear error. (*U.S. v. Jackson* (8th Cir. 2003) 345 F.3d 638, 644.) The Attorney General argues instead that the necessity finding should be reviewed for abuse of discretion, citing the rule followed in the majority of federal circuits (see *U.S. v. Ramirez-Encarnacion* (10th Cir. 2002) 291 F.3d 1219, 1222, fn. 1, citing cases), the Court of Appeal (*People v. Zepeda, supra,* 87 Cal.App.4th at p. 1204), and the courts of other states (e.g., *State v. Cisneros* (1992) 63 Wn.App. 724 [821 P.2d 1262, 1264]). Because our decision would be the same under either formulation, we need not

A. *The Application for Wiretap No. 00-02*

We begin our review of Judge Fidler's findings of necessity by examining the affidavits filed in support of the wiretap applications. (§ 629.50, subd. (a)(4)(B); see *United States v. Martinez* (9th Cir. 1978) 588 F.2d 1227, 1231.) In light of defendants' arguments in this court, we need focus only on wiretap application No. 00-02.[4] The 23-page affidavit in support of this wiretap application established probable cause to believe that communications involving the importation, transportation, and sale of cocaine had been, were being, and would be made over Target Telephone #1 by the target subjects and also established the necessity for the wiretap.

The affidavit began by recounting an investigation begun in 1997 into the Arellano-Felix drug trafficking organization, which engaged in the transportation of multiton quantities of cocaine from Mexico into the United States. The investigation resulted in the arrest in June 1998 of Jorge Castro, a high-ranking member of the organization, and other coconspirators, as well as the seizure of 3,500 kilos of cocaine and over $15 million in proceeds. Unfortunately, even after the arrests, many of the distribution cells to which Castro had delivered cocaine remained intact. Through wiretaps on a since discarded target telephone, the task force had discovered that an unidentified person was in contact with narcotics traffickers from the Los Angeles-based distribution network cells that used to receive cocaine from the Castro organization and with numerous Mexico-based telephone numbers known to be used by members of the Arellano-Felix organization. Based on its investigation, the task force believed the unidentified person who had used the discarded target telephone was a top-ranked United States-based manager for the Arellano-Felix organization, with responsibilities that paralleled those formerly held by Castro. Although the discarded target telephone was deactivated for lack of payment in July 1999, the task force believed, based on the large number of telephone numbers in common, that Target Telephone #1 was being used by the same person or a close associate.

The affidavit also noted that Target Telephone #1 was a prepaid cell phone and had been purchased by someone providing a fictitious address and possibly a fictitious name. High-level drug traffickers frequently use prepaid

---

decide here precisely how to phrase the deference due a judicial finding of necessity under section 629.52(d). (See *U.S. v. Smith* (4th Cir. 1994) 31 F.3d 1294, 1298.)

[4] Leon makes no independent challenge to the other wiretap applications; he argues summarily only that those subsequent filings suffer from "essentially the same" defects as the affidavit in support of wiretap No. 00-02 to the extent they reiterate its analysis or, to the extent they contain new information, are the tainted fruit of the prior wiretap. Aceves, who simply joins in Leon's arguments on the merits, likewise makes no separate challenge to the other wiretap orders.

cell phones because no identification is required for activation, the phone can be discarded at any time, and law enforcement will be unable to track down the user's new telephone.

The discussion of the necessity for the wiretap was set forth in a separate section of the affidavit consisting of 20 numbered paragraphs. The affidavit stated that normal investigative techniques had failed, appeared reasonably unlikely to succeed if tried, or were too dangerous to achieve the objectives of the investigation, "that is, to obtain direct evidence that will convince a jury beyond a reasonable doubt of [¶] a. The full scope, extent and personnel of the narcotics trafficking conspiracies to which I believe [the target subjects] belong; [¶] b. The identity and role of all suppliers of narcotics to the identified conspirators; [¶] c. The identity and role of the main customers of the identified conspirators; [¶] d. The stash location where the narcotics are stored before distribution; [¶] e. The organization's method of distribution of narcotics; and [¶] f. The management and disposition of proceeds generated by the organization's narcotics trafficking." The affidavit then listed the investigative techniques the task force had used or had considered using, with an explanation as to why each was unlikely to succeed in identifying all members of the organization and establishing beyond a reasonable doubt the full scope of the conspiracy:

As to undercover agents and confidential informants, the affidavit stated that a confidential informant could not be introduced at that time because the true user of Target Telephone #1 and the phone's physical whereabouts were unknown. Nor, for the same reasons, would it be useful to introduce an undercover agent. When the user of Target Telephone #1 was identified, the task force would consider the use of a confidential informant or undercover agent. Such a person, however, would be unlikely to assist in achieving the goals of the investigation, inasmuch as members of a large narcotics trafficking organization generally deal only with known and trusted individuals; the organization's structure is compartmentalized such that suppliers, transporters, distributors, customers, and money launderers do not even know each other; and the organization could become suspicious merely by having an unknown person attempt to engage the organization.

As to physical surveillance, the affidavit reiterated that the user of Target Telephone #1 and the phone's whereabouts were unknown and therefore could not be subjected to physical surveillance. The task force had conducted limited physical surveillance of defendants' residence, but "nothing significant was observed." Special Agent Diederich also stated, based on his training and experience with over 100 narcotics investigations as an agent with the Drug Enforcement Administration, that physical surveillance alone, without wiretap intercepts, could not achieve this investigation's objectives.

Although physical surveillance can be useful in confirming the fact of meetings and other interactions among participants, such observations are generally insufficient to prove their purpose or their content. Moreover, inasmuch as narcotics traffickers run trivial errands most of the time, it was highly likely that blanket surveillance would be detected by the target prior to the pickup or delivery of any significant amount of narcotics, which would compromise the larger investigation. High-level narcotics traffickers, such as the ones here, use sophisticated countersurveillance driving techniques to thwart surveillance. Wiretap intercepts, by contrast, would permit the task force to assemble surveillance for specific meetings and to conduct the surveillance at the meeting place, not at the target's home, which further reduces the risk that the surveillance would be detected.

As to pen registers, trap-and-trace devices, toll analysis, and subscriber information, the affidavit explained that these measures, at best, could provide only a list of the telephone numbers called and the identity provided to the telephone provider but not the content of or the parties to the calls. Inasmuch as toll records had already been used to establish the connection between the discarded target telephone and Target Telephone #1, little more could be gained by these methods of investigation without the assistance of a wiretap. The affidavit also stated that narcotics traffickers often use fictitious information or the assistance of unwitting persons as subscribers for their telephones in order to thwart investigation into their illegal activities—and pointed out that such false information had indeed been given for Target Telephone #1.

As to search warrants, the affidavit explained that they would not be effective because the true user of Target Telephone #1 and the phone's physical location were unknown. Search warrants at this stage thus "could result in law enforcement compromising the larger investigation with minimal results." Once the wiretap revealed the timing of cocaine deliveries and stash locations, the task force would consider the use of search warrants. However, such searches alone would not disclose the full scope of the organization's criminal activities, the methods used by members of the organization, or the identities of those involved. Special Agent Diederich added that, in his experience, records kept by narcotics conspirators are coded and difficult to interpret.

As to witness interviews, grand jury subpoenas, and immunity, Special Agent Diederich declared, based on his training and experience, that these were unlikely to advance—and, indeed, would likely impede—the investigation. Narcotics dealers and customers are unwilling to talk to police or testify before grand juries or at trial because of fears for their safety or for their own culpability. Even when granted immunity, a member of the organization who was of sufficient rank to provide meaningful testimony about the entire

organization would be unlikely to share it because of the fear of retribution against himself or his family. For these reasons, Diederich believed that any attempt to contact a member of the organization would likely cause that person to inform other members of the organization and thus jeopardize the investigation.

As to trash searches, the affidavit reiterated that the true user of Target Telephone #1 and the phone's physical location were unknown. Once locations were identified, the task force would consider the use of trash searches. However, even if trash could be removed without detection (and thus without compromising the investigation), Special Agent Diederich declared, based on his experience, that it would be unlikely to yield significant evidence. Narcotics traffickers go to great lengths to destroy evidence that is possibly incriminating and frequently will dispose of their trash at a site away from their residence.

As to consensual recordings, the affidavit stated that these techniques are subject to the same limitations as confidential informants and undercover agents, discussed above.

Special Agent Diederich concluded by emphasizing that, in his experience, leaders of narcotics trafficking organizations rarely touch the contraband themselves and coordinate the logistics of their criminal activities over the phone. He therefore believed that the only viable means of building an effective case against the target subjects was to intercept their telephone communications, including those made over Target Telephone #1.

### B. *The Record Supported the Finding of Necessity for the Wiretaps Within the Meaning of Section 629.52(d)*

■ Defendants attack Judge Fidler's finding of necessity on a number of grounds. None has merit.

#### 1. *Boilerplate Allegations*

■ Defendants complain first that the affidavit included "boilerplate" discussion of the limitations of traditional investigative techniques and failed to identify any ways in which the investigation into this drug trafficking conspiracy differed from drug trafficking conspiracies generally. Although it is true that " '[g]eneralities, or statements in the conclusory language of the statute, are insufficient to support a wiretap application' " (*U.S. v. Cline* (10th Cir. 2003) 349 F.3d 1276, 1280–1281), the affidavit here did not simply reiterate conclusory language. It instead analyzed with particularity the limitations of each alternative investigative technique in achieving the goals

of this investigation. That many of those limitations are common to most drug conspiracy investigations does not necessarily preclude a finding of necessity. (*U.S. v. Thompson* (8th Cir. 2000) 210 F.3d 855, 859.) In cases of this nature, the same reasons for futility of certain investigative techniques will frequently recur. But "the fact that drug investigations suffer from common investigatory problems does not make these problems less vexing." (*U.S. v. Milton* (8th Cir. 1998) 153 F.3d 891, 895.) There is thus no requirement that the government establish that an individual narcotics investigation differs in some particular way from an ordinary narcotics investigation. "Necessity is a function of the specifics of the case, not its uniqueness. If a seemingly 'ordinary' drug investigation requires a Title III wiretap, and the government establishes that necessity with the particulars of a given investigation, no more is needed. The ordinariness of the investigation does not preclude a finding of necessity for the use of wiretaps to further the investigation." (*U.S. v. Martinez, supra*, 452 F.3d at pp. 5–6.)

Defendants' reliance on *United States v. Kalustian* (9th Cir. 1975) 529 F.2d 585, which contained some contrary language in suppressing electronic surveillance evidence in a gambling investigation, is misplaced. There, "no mention was made of the defendants or the particular circumstances to be investigated." (*United States v. Tufaro* (S.D.N.Y. 1983) 593 F.Supp. 476, 489.) Hence, "*Kalustian* teaches no more than that" an "affidavit composed solely of conclusions unsupported by particular facts gives no basis for a determination of compliance" with the necessity requirement. (*United States v. Spagnuolo* (9th Cir. 1977) 549 F.2d 705, 710; see also *United States v. Williams* (D.C. Cir. 1978) 580 F.2d 578, 588 [188 U.S.App. D.C. 315] [distinguishing *Kalustian* as involving "generalized and conclusory statements that other investigative procedures would prove unsuccessful"].) By contrast, the affidavit here described with particularity the problems with conventional investigative techniques, including those posed by the fact that the identity of the user and the location of Target Telephone #1 were unknown.

Defendants' reliance on *U.S. v. Blackmon* (9th Cir. 2001) 273 F.3d 1204, in which a divided panel of the Ninth Circuit suppressed the fruits of a wiretap in a narcotics investigation, is likewise unconvincing. In that case, the panel majority found that the affidavit contained material misstatements, including untrue claims that surveillance of Blackmon had been attempted and had failed and that cooperating informants possessed only limited knowledge concerning the scope of the criminal enterprise, and omitted any discussion of the potentially successful use of informants, including one who had "special access" to Blackmon. (*Id.* at p. 1209.) Because of these defects, the court elected to review the affidavit, purged of its misstatements, "de novo," without deferring to the judicial finding of necessity below. (*Id.* at p. 1211 (dis. opn. of Wardlaw, J.); see *U.S. v. Yeje-Cabrera* (1st Cir. 2005) 430 F.3d 1,

8 [distinguishing *Blackmon*].) Here, however, we have found (and defendants have conceded) that the judicial finding of necessity below should be reviewed deferentially and that the affidavits contain no material misstatements or omissions. Inasmuch as the Ninth Circuit has subsequently explained that its holding in *Blackmon* "was premised on a finding that the affidavits supporting the wiretap applications were plagued by material misstatements and omissions" (*U.S. v. Fernandez* (9th Cir. 2004) 388 F.3d 1199, 1237), we do not find *Blackmon* persuasive here. (*U.S. v. Canales Gomez* (9th Cir. 2004) 358 F.3d 1221, 1225 [distinguishing *Blackmon* on the ground that "[n]o such misstatements are alleged in this case"]; accord, *U.S. v. Martinez, supra,* 452 F.3d at p. 6.)

### 2. *The Relevance of the Conspiracy Allegations*

██ Defendants argue next that section 629.52(d) does not set forth a lower standard of necessity for conspiracy cases. We agree that a mere allegation "that a person is a member of a conspiracy . . . is not a sufficient reason to obtain a wiretap" (*U.S. v. Carneiro* (9th Cir. 1988) 861 F.2d 1171, 1181), but the People make no such argument here. They argue instead, correctly, that the fact of a conspiracy is a circumstance to be considered, along with all the other facts and circumstances, in determining whether conventional investigative techniques have failed, are unlikely to succeed if tried, or are too dangerous to try. For example, persons involved in a conspiracy almost invariably will discuss their plans, methods, and goals with other members of the conspiracy. A solitary criminal, on the other hand, is unlikely to discuss the crime with others. Concerted action, moreover, "increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality." (*Callanan v. United States* (1961) 364 U.S. 587, 593 [5 L.Ed.2d 312, 81 S.Ct. 321]; accord, *People v. Zamora* (1976) 18 Cal.3d 538, 555–556 [134 Cal.Rptr. 784, 557 P.2d 75].) And, "[u]nlike individual criminal action, which comes to an end upon the capture of the criminal, collective criminal action has a life of its own. Like the Hydra of Greek mythology, the conspiracy may survive the destruction of its parts unless the conspiracy is completely destroyed. For even if some or many of the conspirators are imprisoned, others may remain at large, free to recruit others eager to break the law and to pursue the conspiracy's illegal ends." (*U.S. v. McGuire, supra,* 307 F.3d at pp. 1197–1198.) Thus, in many cases, the existence of a conspiracy will suggest not only that there *will be* communications in order to plan the crime, but that such planning will occur almost *exclusively* during such communications. Furthermore, the existence of the conspiracy may not only increase the likelihood any given crime will succeed, but also the likelihood the criminal enterprise will survive the arrest of less than all of its participants—which is precisely what occurred when the government made its first round of arrests of members of the Arellano-Felix

drug trafficking organization. In sum, the existence of a conspiracy, while not determinative, is an important factor in analyzing the necessity for a wiretap. (Cf. *Scott v. United States* (1978) 436 U.S. 128, 140 [56 L.Ed.2d 168, 98 S.Ct. 1717] ["when the investigation is focusing on what is thought to be a widespread conspiracy more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise"].)

In this case, no one disputes that telephones were the primary means of communication among the conspirators. "It would have been difficult if not impossible by means other than wiretap to determine the scope of the conspiracy or to develop enough evidence to successfully prosecute the conspirators." (*U.S. v. Carrillo* (D.Colo. 2000) 123 F.Supp.2d 1223, 1245; accord, *U.S. v. Khan* (9th Cir. 1993) 993 F.2d 1368, 1370, 1375.)

### 3. *Failure to Exhaust or Otherwise Justify the Failure to Attempt Normal Investigative Techniques*

■ Defendants then argue that the government failed to exhaust several investigative techniques. As they concede, however, the adequacy of the showing concerning other investigative techniques is " 'to be tested in a practical and commonsense fashion,' [citation] that does not 'hamper unduly the investigative powers of law enforcement agents' " (*U.S. v. Smith, supra*, 31 F.3d at p. 1297) and that " 'does not mandate the indiscriminate pursuit to the bitter end of every non-electronic device' " (*U.S. v. Bennett* (9th Cir. 2000) 219 F.3d 1117, 1122). The government " 'need only lay a "factual predicate" sufficient to inform the judge why other methods of investigation are not sufficient.' " (*U.S. v. Williams* (3d Cir. 1997) 124 F.3d 411, 418.) We cannot say that Judge Fidler acted unreasonably in finding that normal investigative techniques had failed or were unlikely to succeed if tried in this case.

### (a) *Confidential Informants*

Defendants, pointing to a sealed portion of the affidavit that indicated the existence of a confidential informant, fault the affidavit for failing to explain why the investigation could not proceed through that informant. Yet defendants fail to explain how the informant could even have identified the user of Target Telephone #1, whose identity and location were unknown, without raising suspicion. As the affidavit explained, members of the organization could be "alarmed by an informant simply approaching one of them and could become concerned that the organization was under investigations." More generally, the affidavit recited that large-scale narcotics organizations are compartmentalized in order to protect the organizations and that confidential informants therefore would not be successful in identifying the full nature and scope of the organizations. (*U.S. v. Canales Gomez, supra*, 358 F.3d at

p. 1226.) Under these circumstances, the government could reasonably have concluded that attempting to connect the informant to this part of the organization would have aroused the suspicions of other participants, thus endangering both its informant and the investigation, without providing sufficient information to achieve its goals. (*U.S. v. Carter* (D.C. Cir. 2006) 449 F.3d 1287, 1294 [371 App.D.C. 269]; *U.S. v. Guerra-Marez* (5th Cir. 1991) 928 F.2d 665, 671.)

(b) *Pen Registers*

Defendants complain that the affidavit merely identified the limitations of pen registers and similar techniques and therefore could not establish necessity for a wiretap. We disagree. "[A]lthough the affidavit's assertions of inadequacy 'might appear boilerplate, the fact that drug investigations suffer from common investigatory problems does not make these problems less vexing.' " (*U.S. v. Thompson, supra,* 210 F.3d at p. 859.) Moreover, the affidavit stated that the task force had already compared toll records for Target Telephone #1 with the discarded target telephone, which had provided the basis for their suspicion that the users were the same or close associates, and announced that the task force intended to initiate a pen register on Target Telephone #1. Because these alternate techniques had not (and could not) identify the persons making or receiving the communications, the contents of the conversations, or whether the communications were in furtherance of the drug operation, they "could not significantly advance" or "achieve the objectives of the investigation." (*U.S. v. Carrillo, supra,* 123 F.Supp.2d at p. 1241; see also *U.S. v. Decoud* (9th Cir. 2006) 456 F.3d 996, 1007.)

(c) *Search Warrants*

Defendants once again fault the affidavit for relying on limitations that would apply to " 'most if not all narcotics investigations.' " What defendants overlook, however, is that the affidavit also explained why those generic limitations applied to this investigation. In particular, defendants do not challenge Special Agent Diederich's statement that "[a]t this time, I know of no locations at which to [execute] search warrants," given that the stash locations, the timing of deliveries, the identity of the user of Target Telephone #1, or the user's location were all unknown. Defendants also challenge the affidavit's failure to discuss the possibility of searching their residence, which was known to the task force—yet offer nothing to suggest that probable cause existed to search their residence. (See *U.S. v. Carrillo, supra,* 123 F.Supp.2d at p. 1237.) More importantly, defendants fail to grapple with the affidavit's concern that a search conducted prematurely could compromise the larger investigation while providing minimal results. (*U.S. v. Carter, supra,* 449 F.3d at p. 1294; *U.S. v. Smith, supra,* 31 F.3d at p. 1299.)

### (d) *Physical Surveillance*

Defendants characterize the affidavit's analysis of physical surveillance as "stating that it is just too bothersome to follow a suspect around while he does 'trivial errands' " and assert that "[b]lanket surveillance may be inconvenient and costly, but it can be done and does work." Yet, as the affidavit discloses, limited surveillance had already been conducted at defendants' residence without success, and the task force knew of no other locations at which to conduct surveillance, especially since the identity and whereabouts of the user of Target Telephone #1 were unknown. Moreover, the affidavit's reference to "trivial errands" was merely to illustrate that without the wiretap, the task force would have to place the known targets under blanket surveillance, which would make it "highly likely" the surveillance would be detected and the investigation compromised. (See *U.S. v. Martinez, supra,* 452 F.3d at p. 5; see generally *U.S. v. Ashley* (1st Cir. 1989) 876 F.2d 1069, 1075.)

### (e) *Trash Searches*

Defendants' contention that the affidavit failed to provide a specific, particularized reason for rejecting this technique is belied by the affidavit itself, which reiterates that the address of the user of Target Telephone #1 was unknown, that narcotics traffickers go to great lengths to destroy incriminating evidence (including carrying their trash away to a different site), and that trash removal by law enforcement poses the risk of detection. Although defendants suggest that the task force could have conducted a trash search of their residence, they have not shown that there was a basis for believing significant evidence would be uncovered though such a search. Defendants thus offer no basis for second-guessing the relative risks and benefits of trash searches in this case. (*U.S. v. Canales Gomez, supra,* 358 F.3d at p. 1224.)

### (f) *Interviews, Grand Jury Subpoenas, and Immunity*

Defendants claim that the affidavit's discussion of these techniques "completely ignore[s] the possibility of a confession being obtained, perhaps based upon a promise of leniency" as well as the potential of detaining a material witness in custody, which "might solve the problem of tipping off others with specific information." In truth, the affidavit considered the possibility that a high-level member of the organization might provide information in exchange for leniency but considered it unlikely "because of fear of retribution against himself or his family." Special Agent Diederich considered it more likely that the conspirator who received such an offer would "inform other members of the organization and thus jeopardize the investigation." Neither a promise of leniency nor the detention of a material witness in custody would alleviate

these concerns. Moreover, granting immunity to an organization member who was at a sufficiently high level to provide significant information would "insulate highly culpable members of the conspiracy from prosecution." (*U.S. v. Martinez, supra,* 452 F.3d at p. 5.) "The government's desire not to alert any of the targets of the investigation is reasonable." (*U.S. v. Carrillo, supra,* 123 F.Supp.2d at p. 1236.)

### 4. *Failure to Consider Aerial Surveillance or Witness Relocation*

Finally, defendants claim the affidavit was deficient in failing to consider two additional investigative techniques: aerial surveillance and witness relocation. Before analyzing these techniques, we note at the outset that "courts are reluctant to impose their hindsight upon law enforcement agencies, and the proponent of the application need not establish that 'every other imaginable mode of investigation would be unsuccessful.'" (*U.S. v. Guerra-Marez, supra,* 928 F.2d at p. 670.) In particular, "[a]fter-the-fact suggestions by defense attorneys as to how an investigation might have been handled are entitled to little weight in the analysis . . . . The fact that the government could have taken some different or additional steps in its investigation does not demonstrate that the wiretap orders were issued in error," because " '[t]he government need not exhaust or explain its failure to exhaust every conceivable investigative procedure before resorting to wiretapping.'" (*U.S. v. Carrillo, supra,* 123 F.Supp.2d at p. 1245.) Indeed, Congress acknowledged that "[m]erely because a normal investigative technique is theoretically possible, it does not follow that it is likely." (Sen.Rep. No. 90-1097, *supra,* 1968 U.S. Code Cong. & Admin. News, at p. 2190.)

Neither of the techniques above was likely to have succeeded in fulfilling the goals of the investigation. Aerial surveillance falls within the affidavit's category of "Physical Surveillance" and suffers from the same limitations and the same risks as surveillance on foot or by automobile. Indeed, as recounted in the application for wiretap No. 00-04, the task force *did* engage in aerial surveillance on January 26, 2000. However, the helicopter lost the "visual" of the open trunk because it had to orbit, and a member of the organization subsequently became aware of the surveillance and employed countersurveillance techniques. Knowledge of the physical surveillance, of course, only increased the necessity for the wiretap. (*U.S. v. Decoud, supra,* 456 F.3d at p. 1007; *U.S. v. Ashley, supra,* 876 F.2d at p. 1075.) As to placing cooperating high-level members of the organization into a witness relocation program, defendants have made no showing that any such person had wanted not only to withdraw from the conspiracy but also to relocate with his or her loved ones under a new identity. (*U.S. v. Carrillo, supra,* 123 F.Supp.2d at p. 1236 ["The investigators had no basis to believe any of the participants would be willing to cooperate"].) Accordingly, approaching a member of the organization with an offer to enter a relocation program posed the same risk of

compromising the investigation as did approaching a member of the organization with an offer of immunity. (See *U.S. v. Gruttadauria* (E.D.N.Y. 2006) 439 F.Supp.2d 240, 248.) In neither circumstance can the affidavit be faulted for failing to identify these particular investigative techniques by name instead of by category, nor have defendants offered any reason for second-guessing law enforcement's assessment of the relative risks and benefits of either technique.

■ As demonstrated above, the wiretap was not sought as the first step in this investigation, nor did the government bypass viable alternative techniques in a rush to use this extraordinary method of investigation. "Few threats to liberty exist which are greater than that posed by the use of eavesdropping devices" (*Berger v. New York* (1967) 388 U.S. 41, 63 [18 L.Ed.2d 1040, 87 S.Ct. 1873]) but, as our Legislature has recognized, that liberty must yield to the real needs of law enforcement in appropriate circumstances. (See § 630.) None of defendants' proposed alternatives, taken singly or in combination, offered a realistic prospect of exposing "the extent and structure of the conspiracy" without the assistance of wiretaps. (*U.S. v. Plescia* (7th Cir. 1995) 48 F.3d 1452, 1463.) In short, defendants have not shown that Judge Fidler acted unreasonably in concluding that the affidavit supporting the application for wiretap No. 00-02 established necessity for the wiretap.

C. *Remaining Issues*

Having rejected defendants' claim that the wiretaps violated section 629.52(d), we reject as well defendants' contention that the wiretaps violated the Fourth Amendment, which rests on the same facts and legal standards discussed above. (See *People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17 [42 Cal.Rptr.3d 677, 133 P.3d 581].) Accordingly, we need not resolve the novel questions presented by the People's petition for review—namely, whether a defendant who has procured a cell phone under a false name and for a criminal purpose can have a legitimate expectation of privacy in conversations made and received on that telephone within the meaning of the Fourth Amendment and, if not, whether Penal Code section 629.72 (which was enacted by a two-thirds vote of each house of the Legislature) expanded the universe of people who may challenge evidence seized as a result of a wiretap beyond the categories defined by the Fourth Amendment. (See *Leroy v. Great Western United Corp.* (1979) 443 U.S. 173, 181 [61 L.Ed.2d 464, 99 S.Ct. 2710] ["As a prudential matter it is our practice to avoid the unnecessary decision of novel constitutional questions"]; *Ashwander v. Valley Authority* (1936) 297 U.S. 288, 346–347 [80 L.Ed. 688, 56 S.Ct. 466] (conc. opn. of Brandeis, J.).)

## DISPOSITION

The judgment of the Court of Appeal is affirmed.

George, C. J., Kennard, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.