Filed 6/5/14  P. v. Valenzuela CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C070699 |
| Plaintiff and Respondent, | (Super. Ct. No. SF117802F) |
| v. | |
| JAIME VALENZUELA, | |
| Defendant and Appellant. | |

Convicted of a drug offense, defendant Jaime Valenzuela contends the trial court abused its discretion when it denied his motion to suppress evidence obtained from a wiretap.  He asserts the affidavit filed in support of the wiretap order failed to establish the wiretap's necessity, as required by state and federal statute, because it relied on "boilerplate material" used in a different affidavit that was not specific to the investigation in this case.  We disagree with his contention.  Read in context with the law enforcement investigations of which it was a part, the affidavit offered sufficient evidence to establish the wiretap's necessity.  We affirm the judgment.

1

FACTS

The challenged wiretap arose from an investigation into the South Side Tracy Norteños, a criminal street gang under the umbrella of the Nuestra Familia prison gang. That investigation, known as Operation Gateway, began in 2010 and continued into 2011. During the investigation, 14 cell phone lines were wiretapped, three of which belonged to John Pantoja, the leader of the South Side Tracy Norteños and a codefendant in the underlying case. His lines were designated as lines 1, 3, and 9.

In April 2011, law enforcement officers intercepted a number of calls and text messages on line 9 between Pantoja and defendant. Based upon the content of these calls, law enforcement believed Pantoja was going to receive methamphetamine from defendant, and that defendant was the source of methamphetamine for Pantoja.

Officers began surveillance of Pantoja. On the night of April 30, 2011, he drove into an orchard, turned off his lights, and met with someone in a dark-colored SUV for a few moments. Then the driver of the SUV turned on its headlights and left the orchard. Next, the back-up lights of Pantoja's vehicle turned on, and Pantoja backed the car out of the orchard.

As Pantoja drove back into Tracy, law enforcement officers stopped him. Searching Pantoja's car at the police station, officers found 116 grams of methamphetamine wrapped in a sock in the car's engine air intake compartment.

In May 2011, officers intercepted a call from Pantoja to defendant on line 3. The two men discussed that Pantoja owed defendant money for the methamphetamine the police had seized from him.

PROCEDURAL HISTORY

A grand jury indicted defendant, Pantoja, and five other defendants on various drug offenses. The indictment charged defendant with transporting and selling methamphetamine (Health & Saf. Code, § 11379), and conspiring to transport and sell

2

methamphetamine (Pen. Code, § 182).[1]  The indictment also alleged the crimes were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).

Defendant filed a motion under sections 629.72 and 1538.5, section 2515 of title 18 of the United States Code, and the Fourth Amendment to suppress the recordings from lines 3 and 9, and the fruits thereof.  He argued the affidavit used to support the district attorney's application for the wiretap order failed to establish the wiretap's necessity as required by section 629.52, subdivision (d), and section 2518(3)(c) of title 18 of the United States Code; namely, that "normal investigative procedures have been tried and have failed or reasonably appear either to be unlikely to succeed if tried or to be too dangerous."

The trial court denied the motion.  A month later, defendant pleaded guilty to the transportation and sale count, and the court dismissed the conspiracy count.  The trial court sentenced defendant to the lower term of two years to be served in the county jail.

DISCUSSION

Defendant contends the trial court abused its discretion when it denied his motion to suppress.  He claims the affidavit submitted in support of the wiretap application failed to establish the wiretap's necessity.  He asserts the affidavit's section on necessity consisted entirely of "boilerplate" material from another affidavit in a different case that was not specific to this particular investigation.  He argues the use of that material rendered the affidavit legally insufficient to establish necessity.  We disagree.

In *People v. Leon* (2007) 40 Cal.4th 376 (*Leon*), our Supreme Court explained the necessity requirement and the amount of evidence necessary to establish necessity in order to obtain a wiretap order.  We quote at length from that opinion:  "Our analysis of section 629.52 is necessarily informed by title III of the Omnibus Crime Control and Safe

---

[1]    Undesignated references to sections are to the Penal Code.

3

Streets Act of 1968, 18 United States Code sections 2510 to 2520, which 'provides a "comprehensive scheme for the regulation of wiretapping and electronic surveillance." ' (*People v. Otto* (1992) 2 Cal.4th 1088, 1097.)  As we have previously observed, title III 'establishes minimum standards for the admissibility of evidence procured through electronic surveillance; state law cannot be less protective of privacy than the federal Act.'  (*Otto, supra*, 2 Cal.4th at p. 1098.)  With respect to necessity, the sole issue presented here, state law and federal law employ identical language.  Each requires the judge, before authorizing a wiretap, to find that normal investigative techniques 'have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous.'  (18 U.S.C. § 2518(3)(c); Pen. Code, § 629.52(d).)

"The requirement of necessity is designed to ensure that wiretapping is neither 'routinely employed as the initial step in criminal investigation' (*United States v. Giordano* (1974) 416 U.S. 505, 515 [40 L.Ed.2d 341]) nor 'resorted to in situations where traditional investigative techniques would suffice to expose the crime.'  (*United States v. Kahn* (1974) 415 U.S. 143, 153, fn. 12 [39 L.Ed.2d 225].)  The necessity requirement can be satisfied 'by a showing in the application that ordinary investigative procedures, employed in good faith, would likely be ineffective in the particular case.'  (*U.S. v. McGuire* (9th Cir. 2002) 307 F.3d 1192, 1196.)  As numerous courts have explained, though, it is not necessary that law enforcement officials exhaust every conceivable alternative before seeking a wiretap.  (*Id*. at p. 1197; see also *Twenty-seventh Annual Review of Criminal Procedure, Investigation and Police Practice:  Electronic Surveillance* (1998) 86 Geo. L.J. 1289, 1294-1295, fn. 420 [collecting cases].)  Instead, the adequacy of the showing of necessity ' "is 'to be tested in a practical and commonsense fashion,' . . . that does not 'hamper unduly the investigative powers of law enforcement agents.' " '  (*U.S. v. Oriakhi* (4th Cir. 1995) 57 F.3d 1290, 1298.)  A determination of necessity involves ' "a consideration of all the facts and circumstances." '  (*United States v. Hyde* (5th Cir. 1978) 574 F.2d 856, 867, quoting

4

Sen. Rep. No. 90-1097, 90th Cong., 2d Sess. (1968), reprinted in 1968 U.S.Code Cong. & Admin. News, pp. 2112, 2190.)

"The finding of necessity by the judge approving the wiretap application is entitled to substantial deference. (*People v. Zepeda* [(2001)] 87 Cal.App.4th [1183], 1204; accord, *U.S. v. Martinez* (1st Cir. 2006) 452 F.3d 1, 4; *U.S. v. McLee* (7th Cir. 2006) 436 F.3d 751, 763; *U.S. v. Butz* (9th Cir. 1993) 982 F.2d 1378, 1383.)" (*Leon, supra*, 40 Cal.4th at pp. 384-385, fn. omitted.)

"The necessity requirement is not to be treated hypertechnically. We expect the government to act 'in a common sense fashion,' and on review we will take in 'all the facts and circumstances in order to determine whether the government's showing of necessity is sufficient to justify a wiretap.' [Citation.] The overall burden on the government 'is not great.' [Citations.]" (*U.S. v. Verdin-Garcia* (10th Cir. 2008) 516 F.3d 884, 890.) It " ' "need only lay a 'factual predicate' sufficient to inform the judge why other methods of investigation are not sufficient." ' (*U.S. v. Williams* (3d Cir. 1997) 124 F.3d 411, 418.)" (*Leon, supra*, 40 Cal.4th at p. 392.)

In *Leon*, the defendants made the same complaint defendant makes here, "that the affidavit included 'boilerplate' discussion of the limitations of traditional investigative techniques and failed to identify any ways in which the investigation into this drug trafficking conspiracy differed from drug trafficking conspiracies generally." (*Leon, supra,* 40 Cal.4th at p. 389.) The high court's response applies equally here: "Although it is true that ' "[g]eneralities, or statements in the conclusory language of the statute, are insufficient to support a wiretap application" ' (*U.S. v. Cline* (10th Cir. 2003) 349 F.3d 1276, 1280-1281), the affidavit here did not simply reiterate conclusory language. It instead analyzed with particularity the limitations of each alternative investigative technique in achieving the goals of this investigation. That many of those limitations are common to most drug conspiracy investigations does not necessarily preclude a finding of necessity. (*U.S. v. Thompson* (8th Cir. 2000) 210 F.3d 855, 859.) In cases of this

5

nature, the same reasons for futility of certain investigative techniques will frequently recur.  But 'the fact that drug investigations suffer from common investigatory problems does not make these problems less vexing.'  (*U.S. v. Milton* (8th Cir. 1998) 153 F.3d 891, 895.)  There is thus no requirement that the government establish that an individual narcotics investigation differs in some particular way from an ordinary narcotics investigation.  'Necessity is a function of the specifics of the case, not its uniqueness.  If a seemingly "ordinary" drug investigation requires a Title III wiretap, and the government establishes that necessity with the particulars of a given investigation, no more is needed.  The ordinariness of the investigation does not preclude a finding of necessity for the use of wiretaps to further the investigation.'  (*U.S. v. Martinez, supra,* 452 F.3d at pp. 5-6.)" (*Leon, supra*, 40 Cal.4th at pp. 389-390.)

Seen in context of all of the facts and circumstances, the affidavit presented to us as the one used to obtain the wiretap on lines 3 and 9 sufficiently established necessity.  It laid a sufficient factual predicate of the investigation done into Norteños in general and in this case, and it explained why traditional methods of investigation were not sufficient. This was the common type of gang conspiracy investigation foreseen in *Leon* that involved limitations on investigative methods that occur in many gang investigations. That the affidavit relied in part on language from another wiretap affidavit related to this case did not, in this instance, render it legally insufficient.[2]

Defendant criticizes the affidavit because its section entitled "Necessity and Exhaustion" is virtually identical to an affidavit filed in 2008 for a wiretap in another San

---

[2]     The affidavit defendant included in his motion to suppress and included in our record was not the affidavit used to obtain the wiretaps on lines 3 and 9.  It was an affidavit used earlier in the same investigation to obtain wiretaps on line 1, also used by Pantoja, and line 2, used by another defendant, Jose Martinez.  However, the prosecutor did not object to reviewing the affidavit as the one used for the wiretap on lines 3 and 9, and the trial court assumed as much.  We will do the same.

6

Joaquin County gang investigation, Operation Monster, which resulted in arrests of Norteños for serious felonies, including felony drug violations, and connected the South Side Tracy Norteños to drug trafficking. Defendant would have us focus on only the specific section on necessity without placing it in the context of Operation Monster and another criminal investigation into the Norteños, as well as the investigative work done in Operation Gateway that connected Pantoja to the South Side Tracy Norteños and drug trafficking. He would have us strike the affidavit not because the explanations of necessity are invalid or unsupported by all the facts and circumstances that pertain to them, but because they repeat the explanations given for another related, and similar, wiretap. We will not adopt defendant's narrow approach.

The affiant was Daniel Garbutt, special agent with the California Department of Justice's Bureau of Narcotic Enforcement. Agent Garbutt detailed the context in which Operation Gateway took place, the investigative techniques used in the operation before seeking the wiretap order, and the reasons the wiretap order was necessary in this case.

Agent Garbutt explained that Operation Gateway grew out of two prior investigations into Norteño gangs. The first, Operation Monster, occurred in 2008 and was based in Stockton. During Operation Monster, multiple wiretap orders were issued for multiple target telephones, and more than 10 Norteño gang members were arrested for serious felonies, including felony drug offenses and weapons violations. One of those arrested and later convicted was Jose Martinez. Officers had intercepted a call to Martinez regarding a potential purchase of methamphetamine.

The second investigation occurred in the spring of 2010. This investigation, known as Operation Crimson Tide, was a multijurisdictional investigation into Nuestra Familia regiments and Norteño gangs in Yuba, Sutter, Colusa, Sacramento, and Stanislaus Counties. It included 13 wiretap orders on 16 target telephone lines, and resulted in the arrest of over 30 Norteño gang members for serious felonies, including drug felonies. One of the persons arrested in Operation Crimson Tide was recorded

7

having conversations with John Pantoja regarding Pantoja's plans to purchase methamphetamine.

These investigations led law enforcement officials to launch Operation Gateway in Tracy. With Operation Gateway, law enforcement sought to identify (1) the nature of serious felonies, including drug felonies, being committed by Norteño gang members; (2) the gang members committing those felonies; (3) the locations and means by which they were committing them; (4) when and where the felonies were being committed; (5) the means of communications used by the gang members; and (6) the extent gang members were participating in acts of violence to further the gang.

In undertaking Operation Gateway, law enforcement officers used many traditional investigative techniques. Agent Garbutt explained that officers used search warrants to obtain cell phone subscriber information, call detail records, and text messages from phone companies on phones used by South Side Tracy Norteño gang members; informants; witness interviews and court testimony; and court-ordered pen registers, trap and trace devices, and telephone toll and subscriber information.

Agent Garbutt detailed the evidence officers obtained from these methods. They learned John Pantoja was the leader of the South Side Tracy Norteños, and that Jose Martinez was one of Pantoja's associates. Text messages made in the fall of 2010 and taken from one of Pantoja's phones discussed narcotics trafficking, supervision and direction of the gang, and orders for violence. Pantoja also arranged for someone to travel to Hollister to pick up narcotics.

A September 2010 homicide involved three Norteños as suspects. One of the suspects who fled to Mexico stayed in phone contact with a gang member named Edwin Ruelas. Law enforcement reviewed text messages between Ruelas and Pantoja's phone, and learned Ruelas was traveling to Hollister at Pantoja's direction to pick up narcotics and bring them to Tracy.

Other text messages linked Ruelas to Pantoja and to another gang member, Matthew Espinoza. Law enforcement believed Espinoza was Pantoja's "right hand man." In a number of these messages, Pantoja, Espinoza, and Ruelas expressed paranoia that they were being watched by the police. Pantoja and Espinoza reacted to this feeling by changing cell phone numbers on a regular basis.

Law enforcement also reviewed text messages between Pantoja and his sister, Stephanie Cardoso. The two spoke of drug transactions and Cardoso's desire to obtain methamphetamine from Pantoja. Law enforcement also used confidential informants to purchase methamphetamine from Cardoso in the fall of 2010.

In a November 2010 murder trial, a witness and informer, Mark Garcia, testified that his uncle, John Pantoja, was the leader of the South Side Tracy Norteños. When later interviewed by police, Garcia, a self-admitted and validated South Side Tracy Norteño, stated he had spoken with Pantoja. Pantoja and other gang members knew Garcia had given information to the police about them. Pantoja told Garcia he would not go looking for Garcia himself, but Garcia had better stay out of Tracy and out of county jails.

With the help of pen registers and trap and trace devices, officers had learned line 1 belonged to Pantoja, and line 2 belonged to Martinez. The phones had been used hundreds of times for calls between each other, between Pantoja and Cardosa, between Pantoja and another gang member, and many times with other unknown persons, including someone in Hollister.

After recounting the investigative techniques used and the evidence obtained from them, Agent Garbutt stated these traditional techniques had established probable cause for the wiretaps on lines 1 and 2, and, presumably, lines 3 and 9. In particular, probable cause existed to tap Pantoja's phone lines because, as the leader of the South Side Tracy Norteños, he would likely use his lines to direct and oversee all of the gang's criminal

9

activity, including the use of violence. He would also approve acceptable drug sources and direct the distribution of drugs in his gang.

In a section entitled "Necessity and Exhaustion," Agent Garbutt explained that although these traditional techniques had established probable cause in this case, they had not succeeded, and could not succeed, in achieving Operation Gateway's goals. He examined numerous investigative techniques and explained why they would not fully meet the investigation's goals. Confidential informants and witnesses would be threatened or hurt by gang members upon learning their identity, and the informants likely would not testify. Agent Garbutt had used some informants, but he had not found any that were able "to fully penetrate" the gang. Undercover police officers also could not effectively penetrate the gang, and using them as informants would be extremely dangerous. Wiretaps would allow officers to obtain admissions from the perpetrators themselves.

Physical surveillance would not be effective without the assistance of wiretaps. Gangs were wary of surveillance, and the risks of detection were high, especially in a residential neighborhood. Surveillance was also risky to the officers. Because surveillance was difficult at night, officers would have to position themselves closer to the target, making them and their vehicles more vulnerable. With the wiretaps, agents could initiate selective surveillance when it appeared criminal activity would take place.

Search warrants had been used, but their continued use could undermine the investigation. Execution of a warrant at any location would alert the gang members to the investigation without assuring any evidence would be recovered. Members would change their behaviors, and the investigation would fail to meet its goal of identifying all gang members and dismantling the gang. Wiretaps would facilitate timely, productive searches and seizures while minimizing the risk of compromising the investigation.

Pen registers, trap and trace devices and telephone toll analysis had already been used, but the data from those techniques did not identify the users of phone lines. Also,

10

the data was often provided to officers some time after the phone calls had actually been made, negating the data's value to support selective surveillance.

Grand jury investigations would likely not be successful. Persons knowledgeable about the gang's crimes would be those involved in those crimes, and they would likely not risk prosecution by law enforcement or abandonment, or worse, by the gang. Immunity would have to be granted, and the mere initiation of a grand jury investigation would reveal the investigation's existence and render it difficult to proceed.

Trash searches at Norteño locations have rarely produced sufficient evidence to prove criminal conduct. They could reveal who occupies a residence, and they may be used for that purpose, but more is needed to meet the investigation's goals.

Closed circuit television monitoring could be used to see who associates with whom in the gang, but unlike wiretaps, it would not disclose evidence of conversations, agreements, or other oral arrangements for conducting criminal acts.

In short, Agent Garbutt concluded these traditional techniques alone would not allow investigators to meet the investigation's goals. Wiretaps, however, would. They would allow investigators to identify felonies being committed; the persons committing them; when, where, and how they are being committed; the means of communications gang members are using to commit them; and the extent to which they involve violence. All of this information could be obtained without the risks inherent in other forms of investigative techniques.

Agent Garbutt's affidavit satisfies the Supreme Court's test for establishing the necessity of wiretaps. Considered in light of the information derived from Operation Monster and Operation Crimson Tide, and all of the evidence gained without wiretaps in Operation Gateway, the affidavit sets forth a factual predicate sufficient to inform the trial court why traditional methods of investigation would not adequately meet the investigation's goals.

11

Defendant faults this section of the affidavit because it is nearly identical to an affidavit filed for a wiretap in Operation Monster. But in doing so, defendant fails to read the affidavit in the context of all of the surrounding facts and circumstances and in a practical and commonsense fashion. This wiretap application followed from Operation Monster, as well as Operation Crimson Tide, two previous investigations into Norteño activity in the Central Valley. Both of them involved numerous wiretaps and both led law enforcement to investigate the South Side Tracy Norteños as part of that activity. In this circumstance, where the paths of investigation are well worn and the obstacles are routinely experienced, the necessity requirement should not be interpreted as imposing on law enforcement officers a superfluous duty to customize how this investigation is unique from other similar investigations when in fact it is not. Common sense dictates that officers, in the expediency of a criminal gang investigation, should be allowed to demonstrate a necessity for wiretaps with a sufficient factual showing of probable cause and an explanation, based on common past experience where applicable, why wiretaps are needed.

Agent Garbutt's affidavit satisfied this test.

DISPOSITION

The judgment is affirmed.


                                                        NICHOLSON      , J.


We concur:


      BLEASE         , Acting P. J.


      BUTZ           , J.