Filed 12/15/23  P. v. Salvant CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MARVEL SALVANT,<br><br>    Defendant and Appellant. | A164779<br><br><br>(Alameda County Super. Ct.<br>No. 18CR019696A) |

A jury convicted Marvel Salvant of first degree murder committed by lying in wait (Pen. Code, §§ 187, 190.2, subd. (a)(15), undesignated statutory references are to this code) and for financial gain (§ 190.2, subd. (a)(1)), and of unlawful possession of a firearm by a felon (§ 29800, subd. (a)(1)); it also found true various special circumstances — that Salvant personally inflicted great bodily injury and personally and intentionally discharged a firearm during the murder.  (§ 12022.7, subd. (a), 12022.53, subds. (a)–(d).)  The trial court sentenced him to life in prison without the possibility of parole.  On appeal, Salvant contends reversal is required due to instructional error, the erroneous admission of evidence, and various claims related to search warrants and wiretaps.  We affirm.

1

## BACKGROUND

The following facts are set forth in our opinion concerning codefendant Maria Moore's appeal, which we incorporate by reference. (*People v. Moore* (Oct. 27, 2023, A164786) [nonpub. opn.] (*Moore*).) We provide additional facts when discussing Salvant's claims.

"Early on October 8, 2018, Dominic Sarkar was fatally shot in his home. At trial, the prosecution's theory was that Moore and [Salvant] hatched a plan to murder Sarkar and cash in on his life insurance policies." (*Moore, supra*, A164786.)

"Moore met Sarkar in or about 2006. They occasionally had sex, but did not have a dating relationship. In April 2016, she purchased a $500,000 life insurance policy on him from Banner Life Insurance Company, with both of them making payments on the policy. She was the primary beneficiary of the policy; in September 2016, she changed the contingent beneficiaries on the policy from his two daughters, M. and E., to her own son. In 2017, Sarkar purchased a $300,000 life insurance policy from Transamerica on himself, making M. the beneficiary. In January 2018, he changed the beneficiary on the Transamerica policy from M. to Moore.

"In May 2018, Salvant was living in the Sacramento area and dating L.W. At the time, he drove a green two-tone station wagon. Sometime before an October 6 breakup, he showed L.W. a firearm and holster he had in his possession. Also sometime before October 6, he told her that he was 'surveillancing [*sic*] a home where an Indian guy lived' so he could 'rob it' before 'the Indian guy or his family went on vacation.'

"Salvant also dated S.D. [in late 2018]. She knew he drove a green Subaru Outback and lived in the Sacramento area. She occasionally saw a bicycle in his car; she also knew he had a headlamp. Near the end of August

2

2018, he told her 'he was expecting to receive money from a person by the name of Maria' because 'she was coming into some money and they were going to do a business together, or business deal' in which 'Maria' would lend him $20,000 to 'get his business up and running.' He told S.D. that 'Maria' was 'his ex's best friend at one point,' that she 'had a son that was disabled,' and that 'for some reason . . . she was going to get some insurance money.' Salvant was hoping to receive the money 'before Thanksgiving.'

"On July 29, a message was sent from Moore's phone to G.S.'s phone stating, ' "Dominic Sarkar still doing what he does best. Hopefully his life will end soon." ' On August 2, another message was sent from her phone to G.S.'s phone stating, ' "doesn't matter; they are all going down soon." ' On August 6, a third message was sent to G.S.'s phone stating, ' "Dominic Sarkar is still in the house, but they all going down soon." '

"On September 19, Moore sent $500 to Salvant via a wire transfer from a convenience store in Sunnyvale; he received the funds at a check cashing store in the Sacramento area that same day. On September 26, a Facebook message was sent from his account to a user named 'M[.]' asking about where he could find some 'hardware,' which is slang for a firearm. In the afternoon of October 2, a text was sent from Salvant's phone to Moore's stating, ' "it's just a waiting game." ' A reply text from Moore's phone said, ' "Yap." ' On October 5, Salvant went to an indoor shooting range, where he rented a nine-millimeter caliber firearm for shooting practice. He bought a corresponding magazine with ammunition.

"Around 10:43 a.m. on October 7, a text was sent from Salvant's phone to Moore's phone, advising ' "I am set to do everything tonight" ' and asking if they could talk. A call to his phone was placed from hers. Four more voice calls were made between the two phones that afternoon. At around 11:45

p.m., surveillance footage from Sarkar's neighborhood showed a Subaru Outback driving around as if it was 'casing [the] neighborhood.' The footage showed the Subaru parking around 11:51 p.m., after which a person rode a bicycle away from the Subaru toward Sarkar's house and then back toward the Subaru around 12:21 a.m. The Subaru then drove away from Sarkar's house and left the neighborhood.

"Shortly after midnight on October 8, one of Sarkar's neighbors heard and saw flashes of three to four gunshots. The neighbor saw a male with a medium build, wearing dark clothing and a headlamp, flee on a bicycle.

"Responding to a 911 call of possible shots fired, Fremont police did a protective sweep of Sarkar's house. While clearing the house, one of the responding officers found Sarkar in his bed with multiple gunshot wounds, including one to his head. Nine 9-millimeter caliber shell casings were found on the floor in Sarkar's bedroom; it was later established the casings came from the same gun. The officers also found Sarkar's packed luggage, his credit and debit cards, cash, a new cellphone, and the Banner and Transamerica life insurance policies. Fremont Police Detective Brent Butcher arrived at the scene around 2:00 a.m. Based on the condition of the premises — neat and not ransacked — he did not believe a robbery had occurred. From interviews with Sarkar's roommates, the detective learned Moore knew Sarkar, and she 'frequented the house from time to time.'

"On the afternoon of October 8, the detective contacted Moore, who agreed to meet the next day to help with the investigation. The detective also initiated a search for wire transfers, which revealed Moore's September wire transfer to Salvant. He looked up Salvant's criminal history, which revealed a felony conviction in 1992.

"On October 9, Moore told the detective she had known Sarkar for 12 years and, while 'they were not boyfriend and girlfriend, . . . they had an occasional sexual relationship.' Moore 'seemed to get a little bit nervous' when the detective asked her 'if she had sent money to anybody recently,' and she denied doing so despite having wired Salvant money in September. She also said the only person who had given her money recently was Sarkar. Moore told the detective she had been at Sarkar's house between 3:00 p.m. and 7:00 p.m. on October 7 before leaving to help a friend. When Moore asked the detective if she could try to collect on Sarkar's life insurance policy, he told her she should 'just hold on.' Moore gave the police permission to search and extract information from her cellphone. Her phone contained a number for a contact named 'M.S.,' with whom she had exchanged several calls between October 1 and 8.

"On October 11, a surveillance team located Salvant at an address in Citrus Heights, with a green Subaru Outback parked in the driveway matching the description of the vehicle reported to have parked near Sarkar's house on the night of the murder. That same day, Moore called the detective to ask if she could collect on the life insurance policy because 'the victim's daughters were going to be coming from India and she said she was going to be helping them, but had no money.'

"On October 12, a Facebook account belonging to L.W. sent Salvant's Facebook account a message stating, ' "You shared things with me that I will take to my grave. I even still have that other gun holster." ' On October 25, a surveillance team observed him arrive at Moore's apartment complex in a green Subaru. After some time, Moore and Salvant left the complex together; about '10 to 15 minutes' later, he drove away and she walked back into the

5

complex. On November 5, police obtained and executed a wiretap on phones belonging to the two.

"The detective interviewed Moore at the police station on November 14, where she told him about her attempts to transfer $13,000 from Sarkar's account and collect on the life insurance policy. When the detective told her the police had a suspect vehicle, her 'demeanor and body language immediately changed' and she 'seemed a little nervous.'

"On November 15, a surveillance team followed Moore to a parking lot in Redwood City where she met Salvant. The pair walked away from the lot and returned about an hour later, at which point she gave him something the police could not see. The two then drove away in their respective cars. A search of her car on December 5 revealed a cellphone containing messages between Moore and a cellphone connected to Salvant.

"Police arrested Salvant on December 18. A search of his Subaru revealed a business card for a gun supply store, bank cards, and a cellphone; while a search of his residence disclosed a headlamp, gloves bearing 'a dark red substance,' and indicia belonging to Salvant. The detective later examined the Subaru; he opined the car could fit a bicycle if the seats were folded down and miscellaneous items were removed from the rear cargo area. On the same day, the detective interviewed Moore at the police station. The detective told her Salvant's car had been observed in the vicinity of Sarkar's house around the time of the shooting; she acknowledged she had known Salvant for some time through his previous girlfriend 'Ericka,' but she claimed it had 'been a while' since she last spoke to him. Police arrested Moore later that day.

6

"Meanwhile, police executed a search warrant for Moore's home in Sunnyvale. A search of her room revealed 'some life insurance paperwork . . . related to' Sarkar, his passport, checks written to her from him, a $13,000 cashier's check receipt, an affidavit signed by her for collection of his personal property, and a travel itinerary.

"During the subsequent custodial interview, Moore said she last saw Salvant in 'October or November'; she further insisted she had not seen him since at least six or seven months before that or even talked to him since Sarkar's death. Moore downplayed her connection to Salvant, refusing to acknowledge they were friends and denying she knew his last name. When confronted with evidence of her wire transfer to him, however, she reluctantly acknowledged the transfer. She was unable to explain why he would be contacting her while surveilling Sarkar's residence in the days before the murder. She said her texts with Salvant related to his former girlfriend 'Erica,' but she could not provide any further details about the texts.

"The police also conducted a custodial interview of Salvant. He stated that, although he drove through Fremont 'a lot' on drives to and from Monterey, he had not stopped in Fremont for at least the preceding four months. He identified Moore as the best friend of his 'son's mama[]'; he texted with Moore to 'talk to her about Ericka.' He said he and Moore texted 'a lot.' Although he considered her to be 'like family,' they did not talk very often. He could not remember when he last saw her. He denied receiving money from her; he continued to deny receiving money from her even after he saw surveillance footage showing him receive the wire transfer from her. He also denied knowing the meaning of L.W.'s Facebook message to him about taking things he had told her to the 'grave.' He did not know Sarkar had

7

died. He refused to acknowledge the car seen on the surveillance footage around Sarkar's house was his Subaru. He further denied it was his voice on a phone call with Moore discussing Sarkar's insurance proceeds. He denied any involvement in the murder." (*Moore*, *supra*, A164786, fns. omitted.)

The defense argued that another person may have killed Sarkar. After arriving at the murder scene, police detained N.F., a man wearing dark clothing and riding his bicycle in Sarkar's neighborhood. Shortly thereafter, a witness identified N.F. as the person who fled on a bicycle. But the witness also acknowledged being farsighted and making the identification based on the individual's dark clothing and the fact that he was riding a bicycle. Although N.F. did not have a firearm or ammunition in his possession, the police tested him for gunshot residue. A defense expert testified she found particles consistent with gunshot residue in that sample. On cross-examination, however, the expert acknowledged other sources — such as police handcuffs or sitting in a police car — could have accounted for the particles she found.

## DISCUSSION

Salvant asserts various claims and contends reversal is required. We address each claim in turn.

### I.

Salvant contends the uncharged conspiracy instructions the trial court gave to the jury were confusing and lowered the prosecution's burden of proof. We disagree.

Although Salvant was not charged with conspiracy to commit murder, the trial court instructed the jury on uncharged conspiracy (CALCRIM Nos. 416 & 418). Collectively, CALCRIM Nos. 416 and 418 permitted the jury to consider Moore's hearsay statements against Salvant if it found by a

8

preponderance of the evidence that Salvant and Moore conspired to commit a crime and the statements were made to further the conspiracy. Salvant contends the instructions failed to clarify that the preponderance of evidence standard did not apply to the murder charge, thus allowing the jury to find him guilty of murder by that standard rather than beyond a reasonable doubt. We are unpersuaded.

It is well settled that instructional error is not determined by isolated parts of the instructions or from one particular instruction. (*People v. Smithey* (1999) 20 Cal.4th 936, 963–964.) We read the instructions as a whole to determine whether there is a reasonable likelihood they confused or misled the jury. (See, e.g., *People v. Hughes* (2002) 27 Cal.4th 287, 341.) Here, in addition to CALCRIM Nos. 416 and 418, the trial court instructed the jury with CALCRIM No. 220, which explained the presumption of innocence and the prosecution's obligation to prove Salvant was guilty beyond a reasonable doubt. And CALCRIM No. 521 explained the prosecution has "the burden of proving beyond a reasonable doubt that the killing was first degree murder."

We conclude there is no reasonable likelihood the instructions confused or misled jurors concerning the differing burdens of proof attached to the admission of the hearsay evidence and the charged crimes. Nor is it reasonably likely a jury would conclude the lower standard of proof applied to the murder offense. (*People v. Reliford* (2003) 29 Cal.4th 1007, 1012–1016.) We presume the jurors understood, correlated, and correctly applied the reasonable doubt standard in finding Salvant guilty of murder. (See *People v. Carey* (2007) 41 Cal.4th 109, 130.)

We disagree with Salvant's contention that the uncharged conspiracy had to be proved beyond a reasonable doubt. " 'Conspiracy principles are

9

often properly utilized in cases wherein the crime of conspiracy is not charged in the indictment or information.  In some cases, for example, resort is had to such principles in order to render admissible against one defendant the statements of another defendant.' " (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1200.)  This is what occurred here.  The prosecution did not charge Salvant with conspiracy; nor were they trying to convict him of that crime.  Their theory "was merely 'a vehicle for using otherwise inadmissible hearsay evidence against' [Salvant] by the use of the coconspirator exception to the hearsay rule." (*People v. Jourdain* (1980) 111 Cal.App.3d 396, 403.)  The prosecutor's closing argument that Salvant and Moore conspired to kill Sarkar does not alter our conclusion.

## II.

Salvant next argues the trial court prejudicially erred when it failed to exclude evidence of statements Salvant made during a recorded call with Moore's son.  We disagree.

Before trial, defense counsel moved in limine to exclude evidence of a recorded call — in the call, Salvant said he had "committed a cardinal sin," was "evil," and a "practiced predator" — arguing it constituted impermissible character evidence, was irrelevant, and was more prejudicial than probative.  At the hearing on the motion, the prosecution argued it was introducing the evidence as a party admission.  The prosecution theory was that "cardinal sin" referred to the murder of Sarkar, and commission of the murder made Salvant a "practiced predator."  Defense counsel countered that the statements concerned Salvant's anger about his ex-girlfriend's new relationship.  Ultimately, the trial court permitted introduction of these remarks.  The court explained the comments were "probative" because they

10

could constitute "an admission" concerning Sarkar's murder, and "any undue prejudice [did] not substantially outweigh its probative value."

We review a trial court's evidentiary ruling under Evidence Code section 352 for abuse of discretion. (*People v. Doolin* (2009) 45 Cal.4th 390, 437.) Under that statute, a trial court has discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) In this context, prejudice "refers to evidence which uniquely tends to evoke an emotional bias against [the] defendant as an individual and which has very little effect on the issues." (*People v. Thomas* (2023) 14 Cal.5th 327, 363, internal quotation marks omitted.)

Salvant contends the admitted statements were not about Sarkar's murder, but instead concerned Salvant's dispute with his ex-girlfriend. That other reasonable inferences could be drawn from the evidence does not mean the trial court abused its discretion by declining to exclude the statements under Evidence Code section 352. (*People v. Thompson* (2022) 83 Cal.App.5th 69, 111.) Salvant was free to — and did — argue there was an innocent explanation for his comments. We cannot conclude, however, that the court abused its discretion in determining the probative value of the evidence — a potential admission to having murdered Sarkar — was substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice.

## III.

Salvant contends the trial court erroneously denied his motion to suppress cellphone data, text messages and other evidence collected pursuant to various electronic search warrants in violation of the California Electronic

11

Communications Privacy Act (CalECPA; § 1546 et seq.). To the extent there was any error, it was harmless.

Before the preliminary hearing, Salvant moved to suppress electronic data and other evidence collected from 12 different warrants. Salvant argued the warrants lacked specificity, were overbroad, and law enforcement failed to segregate and seal certain seized materials that were irrelevant to the investigation. The magistrate denied the motion. After being charged, Salvant renewed his motion to suppress. (§ 995.) But he only argued law enforcement failed to segregate and seal information unrelated to the objective of the warrant and failed to give notice to targets of the warrant. The trial court denied the renewed suppression motion.

Relevant here, CalECPA generally bars a government entity from compelling the production of electronic communication information from a service provider. (§ 1546.1, subd. (a).) It also precludes accessing "electronic device information by means of physical interaction or electronic communication with [an] electronic device," unless pursuant to a warrant. (*Id*. subd. (a)(3).) Among other things, warrants must describe with particularity the information to be seized by including covered time periods and target individuals, and any information collected that is unrelated to the object of the warrant must be sealed. (*Id*. subds. (d)(1)–(2).) Persons may move to suppress information obtained in violation of these requirements. (§ 1538.5, subd. (a).) When reviewing a trial court's ruling on a motion to suppress, we defer to the court's factual findings if supported by substantial evidence. (§ 1538.5; *People v. Woods* (1999) 21 Cal.4th 668, 673.) But we independently review whether those facts satisfy the search and seizure requirements under the Fourth Amendment. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 144–145.)

12

First, according to Salvant, the search warrant for his cellphone data lacked particularity and was overly broad, authorizing seizure of a wide range of information unrelated to the crime for which he was being investigated. These arguments are forfeited because he failed to raise them in his renewed suppression motion. For appellate review of the magistrate's denial of the suppression motion, defendants must renew a motion to suppress in the trial court under section 995. (*People v. Hawkins* (2012) 211 Cal.App.4th 194, 199–200; *People v. Silveria and Travis* (2020) 10 Cal.5th 195, 235 [requiring defendant to " 'inform the prosecution and the court of the specific basis for their motion' " to suppress].) We do not consider Salvant's assertion the failure to renew those issues was the result of ineffective assistance of counsel. He forfeited this argument by belatedly making it for the first time in his reply brief. (*People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9.)

Second, Salvant urges us to reverse based on alleged violations of CalECPA's segregation and sealing requirements — specifically, the failure to segregate and seal information of all his communications over Facebook, including those concerning L.W. This failure, Salvant contends, was prejudicial because law enforcement learned about L.W.'s identity and her relationship with him through this information. Without it, Salvant speculates the prosecution would not have presented L.W., who testified Salvant admitted to conducting surveillance of a home "where an Indian guy lived" so he could "rob it."

Resolving whether any CalECPA violations occurred is unnecessary. Even assuming the trial court failed to suppress evidence obtained in violation of California law, the error was not prejudicial under any standard. (*Chapman v. California* (1967) 386 U.S. 18, 24 [harmless beyond a reasonable

13

doubt under federal standard]; *People v. Watson* (1956) 46 Cal.2d 818, 836 [reasonable probability of a more favorable outcome under state standard].) As a preliminary matter, Salvant fails to explain how L.W.'s testimony was critical to his convictions. More importantly, the record demonstrates it was not — L.W.'s testimony was duplicative of other testimony and evidence. (Cf. *People v. Burney* (2009) 47 Cal.4th 203, 232 [error in admitting evidence that is cumulative of other evidence is harmless].)

Other cellphone evidence and video footage established Salvant was surveilling Sarkar's house one week before and on the night of the murder. Salvant's cellphone data indicated he left his house late at night on September 30 and arrived close to Sarkar's house a little after midnight. He then left the area surrounding Sarkar's house early in the morning, between 4:50 and 5:00 a.m. Cellphone data also showed Salvant reaching the area around Sarkar's house again just past 1:00 a.m. on October 2 and leaving that area around 6:55 a.m. Video footage similarly recorded Salvant's car driving back and forth in Sarkar's neighborhood. Testimony from a homicide officer confirmed this behavior — driving without having any direction — was considered "casing a neighborhood."

Moreover, Salvant's own Facebook records further indicated he was seeking "hardware"— a term often used to refer to guns — shortly before Sarkar's killing. A search of Salvant's car revealed a business card for a gun supply store, and in his home, a headlamp and gloves. Officers learned Salvant used a nearby gun range a few days before Sarkar's killing. He rented a nine-millimeter caliber firearm for shooting practice and purchased a corresponding magazine and 50 rounds of ammunition — the same type of ammunition used in the killing. On October 7, shortly before the killing, Salvant texted Moore " 'I am set to do everything tonight.' " Police further

14

testified to surveillance footage showing Salvant's cellphone and car were in the area of Sarkar's residence at the time of the killing. We see no probability of a better outcome for Salvant in the absence of L.W.'s testimony.

## IV.

Salvant contends the trial court erred by failing to suppress communications intercepted via wiretaps of his and Moore's phones because police failed to demonstrate the wiretaps were necessary to the investigation. We disagree.

The prosecutor requested authorization to intercept Moore's and Salvant's wire and electronic cellular telephone data and communications. The affidavit submitted by an officer in support of the request listed other investigative methods officers had attempted or that had limited utility. For example, the use of undercover agents or confidential informants was not available at that time — there were no known informants with knowledge of the murder and, given the violence of the murder, those involved would not trust strangers who are undercover police officers. Despite executing several search warrants and other orders, the affiant declared the investigation lacked evidence to prove the full breadth of the conspiracy, the identity of all conspirators, and the guilt of each person. In addition, executing additional search warrants without the benefit of a wiretap would risk losing the opportunity to gather evidence of admissions made by Moore and Salvant after they discovered police were investigating them. Physical surveillance, as well as pole cameras, vehicle cameras, and additional electronic surveillance, the officer further declared, had limited utility in identifying the contents of communications between Salvant and Moore during any meetings. Similarly, phone traces would reveal the existence of communication, but not their contents. Interviews of suspects or individuals

15

close to the defendants and with knowledge of the events, while an available option, was unlikely to result in truthful statements. The trial court issued a series of orders authorizing wiretaps of Moore's and Salvant's cellphones.

Salvant later moved to suppress evidence gathered through the wiretaps. He argued the affidavit supporting the request did not demonstrate that other investigative techniques were unavailable to achieve the goals of the investigation, other investigative measures had uncovered voluminous evidence, and at the time of the application, law enforcement had sufficient evidence to charge him and Moore. On that basis, he argued wiretapping was unnecessary. The trial court disagreed, finding the officer's affidavit established other investigative techniques had been exhausted, and the pursuit of other investigation methods would not be productive or would endanger the safety of others.

Generally, wiretapping is prohibited. (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1053.) The Presley-Felando-Eaves Wiretap Act of 1988 (§ 629.50 et seq.), however, authorizes a wiretap if there is probable cause to believe an individual has committed several enumerated offenses, including conspiracy to commit murder, the communications concerning illegal activities will be obtained through the wiretap, and the communications device will be used by the person whose communications are to be intercepted. (§ 629.52, subd. (a)(2), (6), (b)–(c).) A judge may enter orders authorizing a wiretap only if necessary — meaning "[n]ormal investigative procedures have been tried and have failed or reasonably appear either unlikely to succeed if tried or too dangerous." (*Id*., subd. (d).) The necessity requirement "ensures that wiretapping is not routinely used as an initial step in a criminal investigation or when traditional investigative techniques would expose the crime." (*Sedillo*, at p. 1056.) Defendants may

16

move to suppress the contents of communications intercepted by wiretap only on the basis that the contents were obtained in violation of the statute or the Fourth Amendment of the United States Constitution. (§ 629.72.) We independently determine the legality of the search based on the trial court's factual findings but give substantial deference to the court's necessity finding. (*People v. Roberts* (2010) 184 Cal.App.4th 1149, 1171–1172.)

The affidavit here satisfied the necessity requirement. As a preliminary matter, it established law enforcement's focus on obtaining communications between Moore and Salvant to investigate the extent of any conspiracy, such as other individuals, to murder Sarkar. Since those involved in a conspiracy discuss their plans and methods with conspirators, the existence of a conspiracy "is an important factor in analyzing the necessity for a wiretap." (*People v. Leon* (2007) 40 Cal.4th 376, 391–392 (*Leon*) [planning to commit a crime "will occur almost *exclusively* during such communications"].)

The affidavit further analyzed the limitations on each alternative traditional investigative technique — undercover work, execution of search warrants, surveillance, and use of pen registers — and the unlikelihood of ordinary investigative procedures being effective here. (*People v. Sedillo*, *supra*, 235 Cal.App.4th at p. 1056.) The officer explained that phone traces could not identify "the contents of the conversations, or whether the communications were in furtherance of" the murder-for-hire conspiracy. (*Leon*, *supra*, 40 Cal.4th at p. 393.) In addition, the officer explained the search warrants law enforcement had already used provided minimal results — they could not uncover identities of all persons potentially involved in the conspiracy or the extent of their guilt. (*Ibid*.) Likewise for physical surveillance — while the physical surveillance law enforcement already

conducted was helpful establishing Salvant and Moore met with each other after the murder, the officer explained they were unable to learn the content of these discussions. (*Id*. at p. 394.) In making these statements, the affidavit explained "the retroactive or prospective failure of several techniques that reasonably suggest themselves." (*People v. Roberts, supra*, 184 Cal.App.4th at p. 1172.) Rather than simply reiterating in conclusory language, as Salvant contends, the affidavit "analyzed with particularity the limitations of each alternative investigative technique in achieving the goals of this investigation." (*Leon*, at pp. 389–390.) The wiretaps were justified here.

Salvant's assertion that the prosecution applied for the wiretap despite having sufficient evidence to establish he and Moore conspired to kill Sarkar does not persuade us otherwise. "The necessity for the wiretap is evaluated in light of the government's need not merely to collect some evidence, but to 'develop an effective case against those involved in the conspiracy.'" (*United States v. Decoud* (9th Cir. 2006) 456 F.3d 996, 1007 [an effective case requires "'evidence of guilt beyond a reasonable doubt'"]; *Leon, supra*, 40 Cal.4th at pp. 384–385 [analysis of legal issues related to wiretaps issued under state law guided by federal law].) We do not address Salvant's additional argument the wiretap warrant lacked probable cause because there were additional persons, aside from him and Moore, involved in a conspiracy to commit murder. He forfeited this argument by failing to raise it below. (*People v. Davis* (2008) 168 Cal.App.4th 617, 625–627.)

## DISPOSITION

The judgment is affirmed.

18

_____
Rodríguez, J.

WE CONCUR:


_____
Tucher, P. J.


_____
Fujisaki, J.

A164779